IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JERRY LEE LEWIS,

                                                              OPINION and ORDER

              Plaintiff,

                                                              13-cv-457-bbc

      v.

JEROME SWEENEY, BRIAN KOOL,
JOHN KUSSMAUL, MARY TAYLOR,
JEREMY McDANIELS and JARED BARR,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Pro se prisoner Jerry Lee Lewis is proceeding on a claim that several correctional officers (defendants Mary Taylor Jeremy McDaniels and Jared Barr) restrained him in a manner that violated his Eighth Amendment rights on various occasions between March 27, 2012 and May 31, 2012 while escorting him to different parts of the Wisconsin Secure Program Facility. In particular, plaintiff says that the wrist restraints defendants used were too small for him and that defendants cuffed him with his arms behind his back, even though his large size made that type of restraint painful for him. In addition, plaintiff says that he complained to administrators (defendants Jerome Sweeney, Brian Kool and John Kussmaul), but they refused to intervene until Sweeney issued a memorandum on April 16, 2012 requiring the use of larger cuffs on plaintiff and another memorandum on May 31, 2012 requiring double cuffing when restraining plaintiff behind his back.

1

Defendants have filed a motion for summary judgment, dkt. #54, which is ready for review.  Defendants argue that plaintiff has not adduced sufficient evidence that he was harmed by their actions or that they possessed the requisite mental state to meet the requirements for a claim under the Eighth Amendment.  Having reviewed the parties' submissions, I am denying defendants' motion for summary judgment because I conclude that there are genuinely disputed facts with respect to both issues and that a reasonable jury could find in plaintiff's favor.  Fed. R. Civ. P. 56; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).


UNDISPUTED FACTS

Since 2009, plaintiff Jerry Lee Lewis has been a prisoner at the Wisconsin Secure Program Facility in Boscobel, Wisconsin.

On December 23, 2009, plaintiff received a medical restriction from the health services unit for "large ankle cuffs" because of the large size of plaintiff's ankles. (Plaintiff says he is 6'4" and approximately 230 pounds.)  The restriction was posted outside plaintiff's cell door; another copy was at the unit's sergeant station.  The restriction does not say anything about wrist restraints.  (Plaintiff says that he complained to health services staff about the size of ankle *and* wrist restraints in 2009 and that on December 23, "a yellow card was placed on [his] cell door stating 'Large leg restraints' and below that was written in black marker, 'Large-wrist restraints.'"  Plt.'s Aff. at ¶ 14, dkt. #71.)

From December 23, 2009 until March 26, 2012, officers escorted plaintiff using large

wrist restraints and an escort belt.  (Defendants attempt to dispute this fact, but they did not cite any contrary evidence, so I must treat the fact as undisputed.  <u>Procedure to be Used on Motions for Summary Judgment</u>, II.E.2, attached to dkt. #21 ("The court will not consider any factual propositions made in response to the moving party's proposed facts that are not supported properly and sufficiently by admissible evidence.")).  Neither side explains what an escort belt is in their proposed findings of fact, but I understand from the context of the parties' use of the term that an escort belt is a device placed on a prisoner's waist to allow higher-security prisoners to be handcuffed in the front rather than the back.)  From March 27, 2012, to May 31, 2012, all staff used larger restraints and an escort belt when transporting plaintiff, with the exception of defendants Mary Taylor, Jeremy McDaniels, Jared Barr and one other correctional officer.  (Plaintiff says that both the regular-sized restraints and the cuffing behind his back caused him pain.  In particular, plaintiff says that the regular-sized restraints caused "pain from metal digging into [his] flesh and wrist bones" and numbness and tingling in his hands; restraining him behind the back with a single set of cuffs caused "throbbing pain" in his shoulders and the "sensation of [his] shoulders being pulled out of socket"; after the restraints were removed, he experiencing bruising, pain and numbness for up to two days.)

Prison staff may use an escort belt when transporting a prisoner even if the prisoner does not have a medical restriction.  Escort belts are stored on each unit outside the sergeant's station.

On March 27, 2012, Lewis submitted an "Interview/Information Request" that

stated:

> For the past 3 years that I've been at WSPF, every time I've been moved in restraints I've had the black belt used because I cannot get both of my hands behind my back through the cell door slot. Now the unit sergeant says that I have to get some kind of paperwork from medical. Do you know what the sergeant is talking about? Can I get the paperwork to have the belt used?

The same day, health services staff informed plaintiff that his request had been sent to the special needs committee for consideration. Defendant Brian Kool, the supervisor on the unit where plaintiff was housed, is on the special needs committee. (The parties dispute whether plaintiff submitted another "Interview/Information Request" the same day directed at defendant Jerome Sweeney, the prison's security director, in which plaintiff said that the "small handcuffs" were "hurting" him.)

On March 31, 2012, plaintiff complained to defendant John Kussmaul, a sergeant, about an officer (not a defendant in the case) who cuffed plaintiff behind the back using regular-sized cuffs. (According to plaintiff, he told Kussmaul there is a "yellow card" restriction on his cell door for large restraints and Kussmaul said, "We'll see about that." Kussmaul told plaintiff that normal-sized wrist restraints would be used on him and the restraints would be secured behind plaintiff's back. When plaintiff again reminded Kussmaul of his "yellow card" restriction, Kussmaul took the card off the cell door, put it in his pocket and stated, "What restriction on whose door?")

The same day, a nurse assessed plaintiff's wrists for a large cuff restriction. She observed that the regular cuffs extended to 8" at their largest capacity and that plaintiff's wrists measured 8 1/4". In addition, she observed that, after one to two minutes of being

placed in the regular-sized cuffs, plaintiff's wrists had indentations in the skin approximately 1/8-1/4 deep and his hands became red as a result of a decrease in blood flow. The nurse assessed plaintiff with "potential injury for soft tissue due to restrictive tissue for perfusion evaluation secondary to tight cuffs." Defendant Kussmaul was present during the assessment and observed that plaintiff "does not have enough span for the ability to put [his] arms together without great difficulty to allow cuff application." The nurse told plaintiff that her role was to gather information and forward it to the special needs committee for consideration.

Later the same day, another nurse examined plaintiff in response to a complaint about his wrist. (According to plaintiff, his wrists "were swollen and ached something fierce," but the nurse said, "There isn't anything I can do for you." Plt.'s Aff. ¶ 27, dkt. #71. According to defendants, the nurse observed that plaintiff's wrists were slightly swollen and reddened.)

On April 2, 2012, plaintiff submitted three Interview/Information Requests. In the request to defendant Kussmaul, plaintiff asked Kussmaul to "write a memorandum to let someone know how bad it was to put the small cuffs on and pulling my wrists together. At least let someone know that I need the big handcuffs and black belt?" In response, Kussmaul wrote, "If someone asks, I'll tell them."

In plaintiff's request to defendant Kool, he complained about

all the pain that's being inflicted on me with forcing my wrists together and putting the small cuffs on me. Everyone knows that they are causing me pain but they keep doing it. I can't take the pain when staff force my hands behind the back and jam the regular size cuffs on me. Since Dec '09 I've been moved with the black belt and big cuffs. Why are the staff now forcing me to go back to the [smaller] cuffs behind the back.

5

In response, Kool wrote, "HSU is evaluating this need for wrist cuffs.  Staff may either use belt or behind the back.  Their discretion."  In a followup response, Kool wrote that plaintiff needs a "medical restriction" to use the larger cuffs.

In plaintiff's third request, he wrote:

On 3-31-12 I was informed that big hand restraints will no longer be used on me, even though I have a tag on my door saying that big hand and leg restraints are to be used. On 3-31-12 my wrist were measured by HSU staff. Can you somehow get the big hand cuffs back on my tag on my door.

Plaintiff did not receive a response to that request.

On April 3, 2012, plaintiff submitted another request in which he asked for the results of the March 31 assessment because he was "tired of these staff members trying to hurt me with these baby cuffs."  In response, a nurse stated that "it would be up to the M team formerly the special needs committee" to decide whether to approve the request for larger cuffs.  (The parties dispute whether plaintiff submitted a separate request to defendant Sweeney the same day in which he complained that "these little cuffs and forcing my arms back" were "hurting" him.  Dkt. #70-1, exh. 107.)

On April 5, 2012, defendant Taylor escorted plaintiff to the law library.  Plaintiff told Taylor that the wrist restraints were too small "and would cause distress and pain with possible injury to [his] wrist and shoulder areas."  Despite plaintiff's objections, Taylor used the regular-size wrist restraints and did not use the escort belt.  (According to plaintiff, when he asked Taylor why she was not using the belt that she had been using for the last three years, she said, "Sooner or later you'll realize we do what we want around here."  When plaintiff returned from the law library, plaintiff showed Taylor the indentations on his skin

caused by the restraints.  He said, "You need to tell somebody about this," and Taylor responded, "Yeah, okay, I'll do just that."  Plt.'s Aff. ¶ 35, dkt. #71.  )

On April 9, 2012, defendant Kool informed defendant Sweeney that plaintiff was complaining that "he was too stiff or broad to be cuffed behind the back with one set of cuffs."

On April 10, 2012, defendant Taylor escorted plaintiff to the law library.  (According to plaintiff, he asked her why she had not told anyone about "what happened" on April 5. Taylor asked, "Are we going to have to hear your crap again?"  Plaintiff told Taylor that the regular cuffs are "killing" him and "were close to ripping [his] shoulders apart last time." Plt.'s Aff.  ¶ 39, dkt. #71.)  Taylor used the regular-sized restraints on plaintiff and restrained him behind his back on the way to the law library and when she returned plaintiff to his cell.

On April 12, 2012, defendant Taylor demonstrated the use of the regular cuffs on plaintiff in front of defendants Kool and James Sweeney, the security director.  Sweeney stated, "I can see that your hands are already red and swelling."

On April 16, 2012, defendant Sweeney issued a memorandum in which he stated, "A request has been made for the use of large cuffs while escorting Inmate Lewis, Jerry #537276.  The request is approved for large cuffs only.  This will apply to both cuffing his hands behind his back or in front."  Sweeney did not require officers to cuff plaintiff in the front because he believes that cuffing behind the back provides a higher level of security and he was concerned about plaintiff's "assaultive history."   Dfts. PFOF ¶ 58, dkt. #85

7

(Defendants do not provide details about that history or explain why they believe an escort belt would not provide a sufficient level of security, but plaintiff does not dispute this proposed finding of fact for the purpose of summary judgment, so I do not consider whether defendants had valid security reasons for restraining plaintiff behind his back.)

After Sweeney issued the memorandum, defendants McDaniels, Taylor and Barr began using large wrist cuffs for plaintiff, but they continued to cuff plaintiff behind his back rather than use the escort belt.

On April 17, 2012, defendant Taylor escorted plaintiff to the unit barber and then back to his cell.  (According to plaintiff, when Taylor was securing the restraints behind plaintiff's back, she "clipped [plaintiff's] flesh with the jagged part of the right wrist restraint." Plt.'s Aff. ¶ 47, dkt. #71.  When plaintiff complained, Taylor said, "So sue me.")

On April 18, 2012, defendant Taylor escorted plaintiff to the recreation area and then back to his cell.  (According to plaintiff, when he asked Taylor to use the escort belt, she said, "What for?"  After it took Taylor "a long time" to remove the restraints, plaintiff stated, "This is why you need to use the black belt like you used to.")

On April 19, 2012, the special needs committee declined to take action on the ground that defendant Sweeney had "addressed" plaintiff's concerns.

On April 22, 2012, plaintiff submitted an "Interview/Information Request" to defendant Sweeney in which he complained that Sweeney had "refuse[d] to approve the use of a belt" and alleged that officers were "inflicting injury on him when removing the wrist restraints."  In response, Sweeney wrote, "There has been no staff request for the use of an

8

escort belt.  I suggest that you review this with Unit Supervisor Kool."

On April 23, 2012, defendant McDaniels escorted plaintiff to the recreation area, restraining him behind his back using larger cuffs.  (According to plaintiff, when McDaniels brought plaintiff back, it took "a few minutes" for McDaniels to remove the restraints. Plaintiff showed McDaniels the indentations in his flesh and stated, "Someone has to do something about this because this crap isn't cool."  McDaniels said, "Agreed.")

On April 30, 2012, defendant McDaniels escorted plaintiff to the recreation area, restraining plaintiff behind his back using larger cuffs.  (According to plaintiff, when Daniels returned plaintiff to his cell, it took "about two minutes of twisting [plaintiff's] wrist" to remove the restraints.  Plaintiff stated, "Why hasn't anyone said anything about all this to the higher-ups?  You people aren't going to be happy until you snap my wrist or something." In response, McDaniels stated, "You'll have to talk to Sgt. Kussmaul about that—his orders." Plt.'s Aff.  ¶ 57, dkt. #71.)

On May 2, 2012, defendant Taylor escorted plaintiff from the recreation area to plaintiff's cell.  (According to plaintiff, he asked Taylor, "Why hasn't anyone told someone of authority about what you guys have to go through to handcuff me, especially what happens when you try to take the cuffs off?"  Taylor replied, "Who cares?"  Plt.'s Aff. ¶ 59, dkt. #71.)

On May 7, 2012 defendant Taylor escorted plaintiff to the recreation area. (According to plaintiff, Taylor said, "I'm not in the mood to hear your crap today so don't start."  Plaintiff replied, "Yeah, it's okay for you to rip out my arms and wrist, but keep my

mouth shut about it." Plt.'s Aff. ¶ 60, dkt. #71). When Taylor returned plaintiff to his cell, it took her approximately two minutes to remove the restraints.

On May 12, 2012, defendant Barr escorted plaintiff to the law library. (According to plaintiff, after Barr secured the restraints behind plaintiff's back, plaintiff asked Barr, "Are you going to report to the higher-ups about the problems you had forcing my wrists together to secure them?" In response, Barr said, "What problems?" Plt.'s Aff. ¶ 62, dkt. #71. When Barr returned plaintiff to his cell, it took Barr "some considerable time" to remove the restraints, "at one point twisting [plaintiff's] wrist to what felt like the breaking point." When plaintiff asked Barr whether he was going to inform a higher-ranking official about the difficulty he had uncuffing plaintiff, Barr asked, "For what purpose?")

On May 16, 2012, defendant McDaniels escorted plaintiff to the recreation area, restraining plaintiff behind his back with large cuffs. (According to plaintiff, when McDaniels returned plaintiff to his cell, "it took McDaniels a good two-minutes to remove the wrist restraints after twisting [plaintiff's] wrist to the right, then [his] left wrist was twisted to the right." Plaintiff stated, "You have got to tell somebody and get this crap stopped," but McDaniels "tried to blame the incident on how [plaintiff's] wrists were turned." Plt.'s Aff. ¶ 65, dkt. #71.)

On May 21, 2012, plaintiff submitted a health service request in which he asked for an "evaluation for black waist belt." On May 22, 2012, health services staff informed plaintiff that defendant Sweeney had addressed this issue.

On May 23, 2012, defendant McDaniels escorted plaintiff to the recreation area.

(According to plaintiff, he asked McDaniels whether he had spoken to "someone of higher rank about all this distress and pain you guys are causing me without using the black belt." McDaniels said that he had not. After McDaniels secured the restraints behind plaintiff's back by forcing his wrists together, plaintiff said, "Enough of this bullcrap. You have got to tell someone before you wind up breaking something.") When McDaniels returned plaintiff to his cell, it took McDaniels "some time" to remove the restraints.

On May 29, 2012, defendant Taylor escorted plaintiff to the unit barber. While trying to secure plaintiff's right wrist behind his back, Taylor "clipped [plaintiff's] skin with the jagged part of the restraints." Plt.'s Aff. ¶ 72, dkt. #71. (According to plaintiff, he said, "You need to tell someone higher-up in rank about all this pain and distress that's being done to me just to cuff." In response, Taylor said, "Shut up." Id. After Taylor returned plaintiff to his cell, she "about broke [his] wrist trying to remove the restraints by twisting and yanking on" them. Id. at ¶ 73.)

On May 30, 2012, defendant McDaniels escorted plaintiff to the recreation area, using larger cuffs behind plaintiff's back. Plaintiff said, My situation needs some serious attention." When McDaniels returned plaintiff to his cell, McDaniels needed to "twist and pull" on plaintiff's wrists to remove the restraints.

On May 31, 2012, defendant Sweeney issued a memorandum in which he placed plaintiff on a "double cuff restriction," which means that plaintiff would be restrained with two sets of cuffs that are hooked together. Sweeney denied plaintiff's request to be placed on a "cuff in front with waist belt restriction," stating that double cuffing "will allow staff

to maintain a safe and secure transport while also allowing [plaintiff] more comfort while being restrained."

## OPINION

### A.  Scope of Plaintiff's Claim

As an initial matter, it is important to establish the boundaries of plaintiff's claim. Plaintiff discusses events before March 27, 2012 and after May 31, 2012 in his summary judgment materials, but his claim is limited to events that occurred during those two months in 2012.  Plaintiff did not include allegations in his complaint about potential constitutional violations that occurred before March 27, 2012, so I have not considered new allegations about that time period in his summary judgment materials.   Plaintiff did include some allegations in his complaint about events after May 31, 2012, but I did not allow him to proceed on a claim for events after that date because that was the date that defendant Sweeney imposed a double cuff restriction for transporting plaintiff.  Although plaintiff had asked to be transported with a waist belt, he did not allege that the double cuff  restriction was insufficient to eliminate his pain and discomfort during transport.  Plaintiff also includes new allegations about staff failures to comply with the restrictions in place since May 31, 2012, but plaintiff did not seek leave to amend his complaint to add those allegations, so I have not considered them either.

B.  Standard of Review

In the screening order, dkt. #4, I noted that the case law was not clear regarding the appropriate standard of review.  One possibility is the standard for excessive force cases: "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley v. Albers, 475 U.S. 312, 320 (1986).  Another possibility is the standard for conditions of confinement cases: whether defendants were "deliberately indifferent" to plaintiff's health or safety, or, in other words, whether defendants consciously disregarded a substantial risk of serious harm. Guzman v. Sheahan, 495 F.3d 852, 857 (7th Cir. 2007).  Courts have applied both standards to claims involving the allegedly improper use of restraints on prisoners.  Compare Hope v. Pelzer, 536 U.S. 730, 737-38 (2002) (applying deliberate indifference standard to claim that defendants handcuffed prisoner to hitching post for seven hours), and Gruenberg v. Gempeler, 697 F.3d 573, 579-80 (7th Cir. 2012) (applying deliberate indifference standard to claim that defendants restrained prisoner for five days), and Key v. McKinney, 176 F.3d 1083, 1086 (8th Cir. 1999) (applying deliberate indifference standard to claim that defendants placed prisoner in handcuffs and shackles for 24 hours), with O'Malley v. Litscher, 465 F.3d 799, 805 (7th Cir. 2006) (applying excessive force standard to claim that defendants placed plaintiff in five-point restraints for several hours, applied them too tightly and refused to allow plaintiff to use bathroom), and Williams v. Burton, 943 F.2d 1572, 1576 (11th Cir. 1991) (applying excessive force standard to claim that defendants placed prisoner in fourpoint restraints for more than 28 hours).  See also Santiago v. Walls, 599

13

F.3d 749, 757 (7th Cir. 2010) (referring to both excessive force standard and deliberate indifference standard in discussing use of handcuffs in prison).  In other cases, courts have assumed that restraints may violate the Constitution under some circumstances without specifying a standard of review.  Murphy v. Walker, 51 F.3d 714, 718 (7th Cir. 1995) ("If Murphy was indeed shackled to the floor of his cell, and we assume his factual allegations are true for the purposes of this appeal, the district court erred in dismissing this claim.") (internal citation omitted); Wells v. Franzen, 777 F.2d 1258, 1264-65 (7th Cir. 1985) ("[P]laintiff's allegations concerning the conditions of his restraint are sufficient to warrant further examination.").

I concluded in the screening order that the deliberate indifference standard should apply. The Supreme Court has explained that the excessive force standard is appropriate when "corrections officials must make their decisions 'in haste, under pressure, and . . . without the luxury of a second chance.'" Hudson v. McMillian, 503 U.S. 1, 6 (1992) (quoting Whitley, 475 U.S. at 320).  That is not the situation in this case because none of the uses of restraints at issue in plaintiff's complaint relate to a disturbance or any type of emergency.  Rather, each occurred in the context of a routine movement from one part of the prison to another.  Neither side challenges the application of the deliberate indifference standard to this case, so that is the standard I will apply.

In their briefs, defendants assert two arguments:  (1) they were not deliberately indifferent; and (2) plaintiff has not adduced sufficient evidence of injury.  Because I conclude that the facts are genuinely disputed as to both of these issues, I am denying

defendants' motion for summary judgment.

## C. <u>Harm</u>

Defendants' primary argument is that plaintiff has not adduced sufficient evidence of injury.  In particular, they argue that plaintiff "never sought treatment for any injury, pain or discomfort resulting from the use of restraints," and the only medical documentation available shows that plaintiff's wrists "were slightly swollen and redden[ed] from the restraints," Dfts.' Br., dkt. #55, at 14-15, which defendants argue is a "de minimis" injury that is not enough to sustain an Eighth Amendment claim.

Defendants' argument that plaintiff never sought medical treatment is incorrect.  He requested medical treatment on March 31, 2012 because his wrists "were swollen and ached something fierce."  In addition, a nurse determined that there was "potential injury for soft tissue due to restrictive tissue for perfusion evaluation secondary to tight cuffs."  In any event, defendants' argument about plaintiff's failure to seek more medical care is really an argument that plaintiff's allegations of harm are not credible.  Because a court may not consider credibility on a motion for summary judgment, <u>Ortiz v. City of Chicago</u>, 656 F.3d 523, 532 (7th Cir. 2011), that argument is a nonstarter.

Defendants' larger mistake is their assumption that plaintiff needs documented injuries in order to prevail under the Eighth Amendment.  As I stated in the screening order, it is well-established that a prisoner's pain may qualify as a serious harm under the Eighth Amendment.  <u>Smith v. Knox County Jail</u>, 666 F.3d 1037, 1039-40 (7th Cir. 2012);

Rodriguez v. Plymouth Ambulance Service, 577 F.3d 816, 830 (7th Cir. 2009); Walker v. Benjamin, 293 F.3d 1030, 1039-40 (7th Cir. 2002). In arguing that plaintiff has not alleged sufficient harm, defendants simply ignore plaintiff's allegations that he suffered from serious pain each time officers placed regular-sized cuffs on him and restrained him behind his back with only one set of cuffs. Accordingly, I conclude that defendants are not entitled to summary judgment on the ground that plaintiff did not suffer a sufficient injury.

### D. Deliberate Indifference

A prison official is "deliberately indifferent" under the Eighth Amendment if he is aware of a substantial risk of harm to a prisoner and consciously fails to take reasonable measures to help the prisoner. Farmer v. Brennan, 511 U.S. 825, 837 (1994). For the most part, defendants do not deny that they were aware of plaintiff's complaints about the restraints, but they argue that they acted reasonably under the circumstances.

### 1. Defendant Sweeney

In arguing that defendant Sweeney acted reasonably, defendants point to Sweeney's April 16, 2012 memorandum in which Sweeney approved larger cuffs for plaintiff and a May 31, 2012 memorandum in which Sweeney approved a double cuffing restriction for plaintiff. However, the May 31 memorandum has little relevance to plaintiff's claim because, as noted above, in the screening order, I limited plaintiff's claim to events that occurred before May 31. The April 16 memorandum shows that Sweeney took some action to help plaintiff, but

it is not dispositive for the purpose of summary judgment for two reasons.

First, plaintiff says that defendant Sweeney simply ignored two written requests for help that plaintiff sent Sweeney on March 27, 2012 and April 3, 2012.  Defendants object to the admissibility of plaintiff's written requests on the ground that "the cited evidentiary material is not an original and/or complete original document and is inadmissible under Fed. R. Evid. 1002," Dfts.' Rep. to Plt.'s Resp. to Dfts' PFOF ¶ 60, dkt. #85, a rule that requires "an original writing . . . to prove its contents."  However, as was often the case with defendants' evidentiary objections, defendants did not explain the basis for the objection. In particular, they did not explain why they believe the documents are not "original" or "complete."  Under Fed. R. Evid. 1003, "[a] duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate."  Because defendants do not explain their objection, it is impossible to determine whether plaintiff's evidence violates Rule 1002 or 1003.  Thus, for the purpose of defendants' motion for summary judgment, I must assume that Sweeney had notice of plaintiff's problem almost three weeks before he issued the April 16 memorandum and he consciously failed to take any steps to help plaintiff during that time without any justification.

Second, the April 16 memorandum addresses one of plaintiff's complaints (the size of plaintiff's cuffs), but it says nothing about the problems caused by cuffing plaintiff behind his back, even though it is undisputed that defendant Kool informed defendant Sweeney on April 9 that plaintiff was complaining that "he was too stiff or broad to be cuffed behind the

back with one set of cuffs."  Defendants do not explain why Sweeney ignored that issue in his April 16 memorandum except to say that officers had discretion to cuff plaintiff in the front or the back.

A prison official cannot avoid liability under the Eighth Amendment by taking one action if he knows that additional action is needed to solve the problem.  Cf. Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006) ("[M]edical personnel cannot simply resort to an easier course of treatment that they know is ineffective.").  Although it may be that Sweeney's failure to address the problem caused by cuffing plaintiff behind his back was nothing more than an oversight, the evidence is sufficient to allow a reasonable jury to find that Sweeney consciously failed to take reasonable measures to help plaintiff.

2.  Defendant Kool

Defendants argue that defendant Kool acted reasonably because he informed defendant Sweeney of plaintiff's complaint, which is all defendants say that Kool had authority to do.  Again, there are two problems with this argument.

First, it is undisputed that defendant Kool was on the special needs committee, which had the authority to address both of plaintiff's complaints.  Defendants do not explain why the committee waited more than three weeks to address plaintiff's complaints and then concluded that Sweeney had resolved them in his April 16 memorandum, even though that memorandum did not address the problem of cuffing plaintiff behind his back with one set of cuffs.

18

Second, even if I assume that defendant Kool did not have authority to resolve the problem on his own, plaintiff complained to Kool on April 2, 2012, but Kool said nothing to Sweeney until April 9, 2012, and Kool does not suggest that he was unable to talk with Sweeney sooner. Rather, in his response to plaintiff's April 2 request, Kool denied any responsibility for helping plaintiff, stating that the health services unit would determine whether plaintiff should have larger cuffs (even though health services staff denied this) and that it was up to individual officers to decide whether to cuff a prisoner in the back or the front. It is not clear why Kool changed his mind between April 2, 2012 and April 9, 2012 and decided to try to help plaintiff. Again, the explanation may be as simple as Kool making a mistake, but I conclude that a reasonable jury could find that Kool was consciously disregarding plaintiff's complaints during that relatively short period of time.

3. Defendant Kussmaul

Plaintiff has adduced evidence that Kussmaul intentionally interfered with plaintiff's attempt to receive accommodations by removing a card on plaintiff's cell door that indicated that he needed larger restraints and that Kussmaul refused to take steps to help plaintiff even after Kussmaul determined that plaintiff "does not have enough span for the ability to put [his] arms together without great difficulty to allow cuff application." This evidence is sufficient to allow a reasonable jury to find that Kussmaul consciously refused to take reasonable measures to help plaintiff.

Defendants argue that Kussmaul acted reasonably because he "rel[ied] on [the health

services unit] and other prison officials to act within the scope of their responsibility." Dfts.' Br., dkt. #55, at 20. However, defendants do not explain *how* Kussmaul relied on the opinion of health services staff or higher-ranking officials. They do not point to any particular official who told Kussmaul that he did not need to help plaintiff.

Defendants may mean to argue that defendant Kussmaul relied on a nurse's statement on March 31, 2012 that the special needs committee would determine whether plaintiff was entitled to an accommodation. If that is the case, defendants do not cite any testimony from Kussmaul in which he makes that assertion. In fact, Kussmaul's own statement at the time suggests that he believed he had authority to direct officers to change how they restrained plaintiff. On April 2, 2012, plaintiff asked Kussmaul to "write a memorandum to let someone know how bad it was to put the small cuffs on and pulling my wrists together." In response, Kussmaul did not say that he was not authorized to help plaintiff or that plaintiff needed to wait for a decision from the special needs committee. Rather, Kussmaul wrote, "If someone asks, I'll tell them." That statement is evidence that Kussmaul could have taken additional action to help plaintiff, but he chose not to do so. Accordingly, I conclude that defendant Kussmaul is not entitled to summary judgment.

4.  Defendants Taylor, McDaniel and Barr

Finally, defendants argue that officers Taylor, McDaniel and Barr are entitled to summary judgment because they "do not have the authority to issue or grant any medical restrictions/special needs requests." Dfts.' Br., dkt. #55, at 21. This argument has multiple

problems as well.

First, it is undisputed that plaintiff did not need a medical restriction to allow an officer to use an escort belt to transport plaintiff. Rather, both defendant Sweeney and defendant Kool stated that it was up to the individual officer to decide whether a prisoner should be cuffed in the front or the back. Second, even with respect to the larger cuffs, the evidence is disputed whether plaintiff had a medical restriction, and, if he did not, whether a medical restriction was needed. According to plaintiff, officers consistently escorted him using larger cuffs and a belt before March 2012 and that even after that time, defendants Taylor, McDaniel, Barr and one other officer were the only officers who refused to accommodate plaintiff. Plaintiff also says that Taylor, McDaniel and Barr told him repeatedly that they were refusing to accommodate him, not because they lacked authority to do so, but because they did not care about plaintiff's complaints. The one exception is defendant McDaniels, who, according to plaintiff, stated that defendant Kussmaul gave the order to restrain plaintiff behind his back with one set of cuffs. However, even if I assume that Kussmaul gave such an order (none of the defendants says that he did), and that Taylor, McDaniel and Barr did not have authority to accommodate plaintiff, that would not explain why they refused plaintiff's requests to inform higher-ranking officials about his complaints. According to plaintiff, he asked each of these defendants to communicate his concerns up the chain of command, but each of them failed to do so. For these reasons, I cannot grant defendants' motion for summary judgment.

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Mary

Taylor, Jeremy McDaniels, Jared Barr, Jerome Sweeney, Brian Kool and John Kussmaul, dkt.

#54, is DENIED.

Entered this 21st day of October, 2014.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge